STANDARD COAL CO. v. STEWART et al.

No. 4635. Decided June 2, 1928. (269 P. 1014.)
Rehearing Denied Aug. 28, 1928.

274

*F. W. James* and *H. L. Mulliner,* both of Salt Lake City, for appellants.

*Wilson & Barnes,* of Salt Lake City, for respondent.

HANSEN, J.

The plaintiff recovered a judgment in the third district court of Salt Lake County against the defendants for the sum of $1,718.43. The defendants prosecute this appeal.

At the time this controversy arose the plaintiff corporation was engaged in the business of mining coal in Carbon county, Utah. The coal thus mined was sold to various retail coal dealers. The defendants were engaged in the business of selling coal at retail in Salt Lake City, Utah. On May 5, 1925, one of the defendants, for and in behalf of the copartnership, signed a written order for 4,000 tons of coal, to be delivered at the rate of three or four cars per week. The coal was to be shipped between May 1 and July 31, 1925. The price of the coal was fixed at $4.25 per ton, less 50 cents per ton discount. The order was accepted by the plaintiff corporation. The plaintiff shipped to the defendants 2,143.6 tons of coal under the order of May 5, 1925. Of the coal so shipped, 102.1 tons were delivered at the agreed price of $3.75 per ton, with a discount of 50 cents per ton. The remaining 2,041.5 tons were to be delivered at the price provided for in the order of May 5, 1925, namely, $4.25 per ton, less a discount of 50 cents per ton. All of the evidence is to the effect that the defendants were to pay the freight on the coal from the mines of the plaintiff corporation, in Carbon county, Utah, to the yards of the defendants at Salt Lake City, Utah. The freight was advanced by the plaintiff, in the sum of $2.10 for each ton of coal shipped. The discount was allowed by the plain-

tiff as an inducement to the defendants to store the coal during the summer months, when the demand for coal was small.

During the summer of 1925 the Standard Fuel Company constructed a coal yard in what the defendants claimed was within the territory theretofore supplied with coal by the defendants. The Standard Fuel Company was a corporation owned and controlled by the plaintiff corporation. During September, 1925, the Standard Fuel Company had a special sale of coal. The Salt Lake Telegram, a newspaper, published at Salt Lake City, contained the following advertisement:

"Special Notice.
"Grand Opening Standard Coal Yard,
Sugarhouse,
"September 4th and 5th.
"Strand Coal Agency will give 500 pounds of coal free with order for one ton or more delivered to any home east of State street, south of Ninth South to Thirty-Third South. Any order taken either of these dates for 500 pounds of coal will be delivered to any home in this district for $1.00.
"Yours respectfully,
"Strand Coal Agency,
"J. R. Mellus, Mgr."

The special sale was also advertised by means of handbills. Because of this advertisement the defendants claimed that their former customers refused to buy any coal from them unless they sold upon the terms contained in the advertisement, and that they could not sell their stored coal at the price contained in the advertisement without a loss. It further appears that the defendants and the Standard Fuel Company were competitors in furnishing sand and gravel for the construction of buildings and cement pavement. The Standard Fuel Company had put in a bid to furnish sand and gravel for a paving contract at such a low price that it engendered the ill will of the defendants.

As a result of this situation the defendants informed the plaintiff that they could not and would not sell the coal

which they had theretofore purchased from the plaintiff. An effort was made by the officers of the plaintiff corporation and the defendants to adjust their differences. As a result of these negotiations it was agreed that the stored coal remaining in the yards of the defendants should be removed by the plaintiff. The plaintiff offered evidence tending to show that it was also agreed that the defendants should be given credit for all coal removed at the same price as the defendants agreed to pay for the coal. Each of the defendants testified that no price was agreed upon that plaintiff should pay for the coal removed.

Plaintiff's complaint sets out the amount of coal sold and delivered by it to the defendants and the sale price. It is then alleged:

"That thereafter, and on and between the dates of October 20, 1925, and November 17, 1925, plaintiff, with the consent of defendants, removed from said yards of defendants at Salt Lake City, Utah, 1,713.85 tons of said coal, and gave credit to defendants therefor upon said total sum of $12,489 at the rate of $5.85 per ton; i. e., at the rate of $3.75 per ton, together with $2.10 in way of freight, as aforesaid, on each ton so removed, or the total sum of $10,026.02."

The defendants demurred to plaintiff's complaint upon various grounds, among them that the complaint is ambiguous, unintelligible, and uncertain as to whether the credit allowed for the coal removed was allowed in pursuance of an agreement between the plaintiff and defendants, or arbitrarily allowed by the plaintiff. The complaint is uncertain as to whether the plaintiff claims an expressed or an implied agreement was entered into by it and the defendants, fixing the price to be paid for the coal to be removed by the plaintiff. The defect in the complaint in failing to state whether the plaintiff relied upon an expressed or an implied agreement as to the price that should be paid or allowed the defendants for the coal removed did not affect any substantial rights of the defendants, and is therefore not a sufficient reason to justify a reversal of the judgment.

The defendants answered, denying that they purchased the coal here involved from the plaintiff. The answer also sets up a counterclaim. Defendants allege that the coal was sold to them under an agreement whereby they undertook and agreed to store the coal shipped, and agreed to pay for only such coal as was sold or used by them. It is also alleged that plaintiff agreed to assist the defendants in the sale of the coal, and that, if any of the coal was not sold, the plaintiff would remove the coal not sold or used, and pay to the defendants any and all expenses that defendants incurred in handling the coal, and also a reasonable charge for storage. Defendants further allege in their answer that they expended $525 in handling the coal, and that a reasonable storage charge for the coal removed by the plaintiff was $500.

An issue is also raised by the pleadings of the parties and the evidence as to the amount of coal that was removed from defendants' coal yard by the plaintiff.

This case was tried to a jury. The trial court refused to submit defendants' alleged counterclaim to the jury. This is assigned as error. We are of the opinion that no error was committed in such respect. The evidence is all to the effect that the coal was sold and delivered by the plaintiff to the defendants. There is no evidence that plaintiff agreed to pay defendants anything for storage of the coal, or for any expense that defendants might incur in handling the coal.

The court gave, among others, the following instructions:

(9) "The sole and only question submitted for your consideration, gentlemen of the jury, is to determine first the quantity of coal that the plaintiff delivered to the railroad company for the defendants at Standardville, Utah, between the dates of May 5, 1925, and July 31, 1925, under and pursuant to the terms of Exhibit 3, and in this connection you are instructed that the undisputed evidence in the case shows that amount of coal to have been 2,143.6 tons, and then to determine the amount of such coal that was taken back by the plaintiff, under the agreement testified to by the witnesses regarding the ar-

rangement whereby the plaintiff took back a portion or all of said coal. If you shall find that, of the total quantity of coal sold and delivered to the defendants, pursuant to Exhibit 3, to wit, 2,143.6 tons, the amount returned and taken away by the plaintiff from the yards of the defendants did not exceed 1,714.85 tons, then your verdict for the plaintiff and against the defendants will be the sum of $2,409.16, together with interest at the rate of 8 per cent per annum from July 31, 1925."

(10) "If, however, you shall conclude from the evidence that the plaintiff took away from the defendants' yards coal in excess of 1,714.85 tons, then you will subtract the amount that you find to have actually been removed from the 2,143.6 tons, sold and delivered to defendants, and as to such balance as you may find you will allow a recovery in favor of the plaintiff for the first 102.1 tons so remaining, at the rate of $3.25 per ton, plus $2.10 per ton freight, and as to any such balance over and above 102.1 tons you will allow a recovery in favor of the plaintiff at the rate of $3.75 per ton, plus $2.10 freight per ton."

Objections and exceptions were taken to these instructions, and the giving of the same is assigned as error. As before indicated, the evidence is all to the effect that plaintiff originally sold and delivered the coal involved in this controversy to the defendants. The title to the coal was therefore in the defendants when the parties agreed that it should be removed from defendants' yard by the plaintiff. The agreement whereby plaintiff was to remove the coal was, under plaintiff's theory and under the evidence, a resale of the coal by the defendants to the plaintiff. The plaintiff's evidence is that a price was agreed upon and defendants' evidence is that no price was agreed upon.

"Where the parties have agreed upon the other elements of the sale, but have made no reference to the price, * * * the law implies that the goods are to be paid for at what they are reasonably worth." Mechem, Sales, vol. 1, § 207, p. 192.

If, therefore, the jury believed that no price was agreed upon, as claimed and testified to by defendants, it was

their duty to determine the reasonable market value of the coal at the time it was agreed that the plaintiff should remove the same. The price that plaintiff was to pay for the coal removed was an issue under the pleadings and the evidence, and was therefore a question to be determined by the jury. It will be observed that the instructions heretofore quoted do not submit to the jury for determination the price to be paid by the plaintiff for the coal removed.

We are of the opinion that it was error to instruct the jury that the defendants were limited to $3.75 per ton, plus $2.10 per ton freight, for the coal removed by the plaintiff. The error was prejudcial to the defendants. The evidence shows that the coal was purchased at a discount. The price of coal affirmatively appears to have been at least 50 cents per ton more at the time it was agreed that the coal should be removed than it was when purchased by the defendants. Although the defendants were not entitled under the evidence to recover on their counterclaim, they were not precluded, in the absence of an agreed price, from recovering a greater price for the coal removed by the plaintiff than that which the plaintiff gave them credit for. If the jury should have found that the parties did not agree upon the price that the plaintiff was to pay for the coal removed, they would have been justified, under the evidence, in fixing the reasonable market value of the coal removed at a greater value than $3.75 per ton, plus $2.10 per ton freight.

The defendants assign other errors. After the trial court had prepared his instructions the defendants submitted some 16 requests, which the trial court refused to give, because the requests were not submitted within the time required by the rules of the court. Under the provisions of Comp. Laws Utah 1917, § 1791, the district courts of this state are empowered to make rules for their own government and the government of their officers. De-

fendants may not here be heard to complain because the trial court insisted upon the observance of its rules.

It further appears that the jury brought in a special as well as a general verdict in this cause, in pursuance to the instructions given. The special and general verdicts were in conflict. The conflict was not discovered until after the jury was discharged. The verdict was rendered March 16, 1927. On March 22, 1927, the jurors and counsel for the respective parties appeared in court pursuant to notice. The jurors were examined by the presiding judge as to whether or not the special verdict returned by them was in accordance with their findings. Each of the jurors stated that there was an error in the special verdict. Thereupon the trial court set aside the special verdict. The general verdict was permitted to stand. The ruling of the court in setting aside the special verdict is assigned as error. This phase of the case is ably and at some length argued in the briefs of counsel. In view of the conclusions we have reached, the effect of setting aside the special verdict becomes purely academic. It is not probable that a similar situation will occur upon a retrial, and therefore we express no view on this phase of the case.

The judgment is reversed, and this cause is remanded to the trial court, with directions to grant a new trial. Appellants are awarded their costs on this appeal.

THURMAN, C. J., and CHERRY, STRAUP, and GIDEON, JJ., concur.